U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT     2015 NOV -9  AM 11: 27

CLERK

BY_____ ᴴᴶᵉ
          DEPUTY CLERK

| | |
|---|---|
| IN THE MATTER OF THE USE OF A CELL-SITE SIMULATOR TO LOCATE THE CELLULAR DEVICE ASSIGNED CALL NUMBER  (802) 430-1620, WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY / ELECTRONIC SERIAL NUMBER 310410848941677 | Case No. 2:15-mj-151  Filed Under Seal |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Brian Wood, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant

under Federal Rule of Criminal Procedure 41 to authorize law enforcement to

employ an electronic investigative technique, which is described in Attachment B,

to determine the location of the cellular device assigned call number (802) 430-

1620 (the "Target Cellular Device"), which is described in Attachment A.

2.      I am a Task Force Agent with Department of Homeland Security,

Homeland Security Investigations, and have been since January 2014.  I have

received training and participated in investigations involving the use of computers,

cell phones, and other electronic devices, and am familiar with the use of location data provided by cell phone carriers in furtherance of investigations.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     One purpose of applying for this warrant is to determine with precision the Target Cellular Device's location.  However, there is reason to believe the Target Cellular Device is currently located somewhere within this district because information gained pursuant to the Search Warrant issued in this docket on or about October 26, 2015, authorizing the acquisition of location data indicates that the Target Cellular Device has been within Vermont for the majority of days since that warrant issued and was located within Vermont as of this morning.   I am advised that pursuant to Rule 41(b)(2), law enforcement may locate the Target Cellular Device outside the district provided the device is within the district when the warrant is issued.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846 have been committed by Diego Mejia Paredes, and others with whom he has been working in furtherance of

2

those crimes. There is also probable cause to believe that the location of the Target

Cellular Device will constitute evidence of those criminal violations, including

leading to the identification of individuals who were involved in the commission of

these offenses and identifying locations where the target has engaged in criminal

activity.

6.      Because collecting the information authorized by this warrant may fall

within the statutory definitions of a "pen register" or a "trap and trace device," *see*

18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen

Register Statute as well as Rule 41. See 18 U.S.C. §§ 3121-3127. This warrant

therefore includes all the information required to be included in a pen register

order. See 18 U.S.C. § 3123(b)(1).

## PROBABLE CAUSE

### Controlled Delivery of Heroin-Containing Shipment

7.      On or about October 6, 2015, United States Customs and

Border Protection ("CBP") officials in Miami, Florida, inspected a shipment

entering the United States from Guatemala. Other agents at the Burlington Office

of HSI working with me received information from special agents at Miami HSI

who, in turn, had spoken with CBP officials about the following information. The

3

shipment consisted of two boxes that were each wrapped in a plastic cellophane-type material.

8.        According to customs records, the shipment (including packaging, wrapping, and contents) had a gross weight of approximately 55.5 kilograms. Upon inspection, CBP officials discerned that both boxes contained a number of smaller packages, each of which contained a powdery substance.  HSI in Burlington, Vermont, subsequently looked at the contents of the boxes.  One box contained multiple 1.2 kilogram packages labeled "Incaparina."  The other box contained multiple 0.5 kilogram packages labeled "Recimax de Incaparina."

9.        The contents of the three packages from each box (6 packages total) were field-tested by CBP officials in Florida.  The substance from each of the tested packages tested positive for heroin.   The total weight of the powdery-substance contained in these two boxes was initially estimated to be about 37 kilograms.  Based on my training and experience, I know that such quantity is enough heroin to supply one million or more individual dosage bags.  I estimate the street value of the heroin in these packages to be significantly more than $5 million.

10.        This shipment was delivered to HSI in Burlington on October 7, 2015, which performed an additional field-test on two packages from within the shipment.  The result for each package was again positive for heroin.  All packages

4

containing the presumptive heroin were re-weighed and determined to weigh in total more than 40 kilograms.

11.     The shipment was addressed to a Jose Medina, with an address of 5036 Main Street, Manchester Center, Vermont.  HSI agents working with me determined that this address is the location of a Mexican restaurant known as "Cilantro."

12.     On October 8, 2015, law enforcement agents performed a controlled delivery of the shipment to the Cilantro restaurant address.  HSI officers repackaged the shipment to contain approximately two kilograms of the original heroin-containing packages, along with additional material not containing controlled substances, in order to make the shipment appear undisturbed.  Prior to the arrival of the packages at the Cilantro restaurant, law enforcement officers working with HSI observed DIEGO MEJIA PAREDES ("MEJIA") waiting in front of the restaurant in a silver Audi A6 vehicle.  He waited there for over one hour.  Upon the arrival of the delivery truck containing boxes re-wrapped to look like the original shipment, MEJIA approached the agent posing as the delivery person and explained that MEJIA was waiting for the package and that Jose Medina was his cousin.   At that time, MEJIA provided identification, took possession of both packages, and put them both inside the Audi that was parked

outside the restaurant. The package never entered the address to which it was addressed.

13.     As he drove away from the restaurant location, law enforcement officers working with HSI observed MEJIA engage in conduct recognized to avoid surveillance. Specifically, MEJIA appeared to be hyper-vigilant of his surroundings and appeared to be checking for surveillance. Among other things, MEJIA was constantly checking his rear-view mirror, and at one point, he took 3 right turns, almost returning to his starting location, before continuing on his trip. Based on my experience, these actions are indicative of counter-surveillance. A short while later, while driving away with the shipment that contained heroin, law enforcement stopped MEJIA' vehicle.

14.     Immigration records reviewed by HSI agents subsequently confirmed that MEJIA is an alien with a passport from Guatemala. MEJIA was in the United States on a B2 visitor visa. Based on a review of his passport, he arrived in the United States on Monday, October 5 at John F. Kennedy Airport in New York City, having left from Guatemala. This was the same day that the packages were shipped from Guatemala to the United States, with the shipment arriving in the United States on Tuesday, October 6.

15.     Based on my training and experience, I know that quantities of heroin far less than 40 kilograms exceed the amounts that can be considered

6

"personal use." A typical dose of heroin is 31.5 milligrams of heroin, and thus, the amount of heroin seized here was sufficient for over one million individual doses. It necessarily follows that anyone possessing heroin of such large quantity possesses it for purpose of redistribution.

16.     Further, based on my training and experience, people transporting contraband of such significant volume and value are usually individuals who have personal knowledge of the fact that they are transporting contraband, in order to protect the valuable contraband.

17.     HSI and CBP personnel working with me have researched the name "Jose Medina" in public record and law enforcement databases and have found no evidence of anyone by that name having any association with addresses or activities in Manchester Center, Vermont or the surrounding area. Based on my training and experience, I know that the absence of such records suggests the name may be fake, or that it could be the name of a person without immigration status within the United States.

18.     Following his apprehension, MEJIA confirmed he has no cousin named Jose Medina. He also stated, at least initially, that he did not know what was in the boxes. Subsequently, he confirmed that he knew that the boxes contained packages that appeared to be food product. Indeed, he further explained that the packages contained a food product called "Incaparina." MEJIA made this

7

statement without having been shown the contents of the boxes. When shown a photograph of the "Incaparina" packages inside one of the boxes, he responded in the affirmative. He maintained that he was unaware that the packages contained controlled substances.

19.       MEJIA stated he was in the United States to visit his cousin, Tony LAM, and to purchase vehicles to bring back and sell in Guatemala. Law enforcement from Bennington County Vermont and Immigration Records confirm that Tony Lam is Marco Antonio Lam Peralta, a Guatemalan with lawful permanent resident status who lives in Bennington County.

20.       MEJIA claimed that a friend in Guatemala asked MEJIA to do him a favor and pick up two packages at the restaurant in Manchester, VT. MEJIA was to pick up the packages and then contact the friend. The friend was then going to send someone to MEJIA to take possession of the packages. The friend told MEJIA that the packages contained Incaparina, a powder from Guatemala to make drinks for babies and mothers. MEJIA stated that he had never participated in the sending or receipt of packages like this in the past. MEJIA was under the impression that the packages may be headed to Rhode Island or Connecticut. MEJIA had received and signed for the two packages out front of the restaurant and told the delivery person that he was accepting the packages for his cousin. After his arrest MEJIA claimed his only cousin in the area was Tony LAM, but

8

that the packages were not destined for LAM.  MEJIA stated the vehicle he was driving had been provided to him by LAM.

Connections to Tony Lam

21.        Additional investigation has revealed that MEJIA and another unidentified man have been living in a rental property in Winhall, Vermont.  The landlord for this property has advised law enforcement that Tony Lam currently pays the rent to house MEJIA and the unidentified man.

22.        MEJIA consented to the search of his black Motorola cell phone, and his IPhone.  He also consented to the search of the GPS navigation device that was within the Audi A6 vehicle he was in upon his arrest.

23.        The black Motorola cell phone possessed by Mejia Paredes upon his arrest contains images of scenery I recognize to be Niagara Falls. Metadata for these images indicate they were taken on or about September 20, 2015.  I recognize one photo taken on this date to be a "selfie" of Tony Lam (who I recognize based on personal surveillance and comparison to Department of Motor Vehicle photos).   Customs records confirm that Marco Antonio Lam Peralta (who is known as Tony Lam) entered the United States near Niagara Falls on September 20, 2015.

9

24.        According to records obtained from DHL, a previous shipment from the same sender of the package that was discovered to contain heroin on October 6, 2015, was signed for as received shortly after 1pm on September 23, 2015 at a location in or near Manchester Center, Vermont. Images on the Motorola phone that Paredes Mejia possessed upon his arrest include photographs of boxes containing the same "Incaparina" packages as those that were found to contain heroin on the October 6, 2015, shipment. Metadata for these photos indicate they were taken within approximately an hour after the September 23, shipment was signed for.

25.        This Motorola cell phone also contains a series of messages exchanged between "DPareds" and the holder of the phone on September 23, 2015, using the Blackberry messaging application. Based upon data supplied by customs and border protection personnel, I believe that at the time of these messages, Diego Mejia Paredes was not in the United States (records indicate he left the United States in August 2015, and reentered on or about October 5, 2015). These messages are in Spanish. I have consulted with DHS personnel who are proficient in Spanish regarding these messages. The messages appear to include direction from "DPareds" to the holder of the Motorola cell phone with regard to the distribution of "large Incas" and "small Incas." I believe it is probable that the

10

term "Inca" in this context refers to the "Incaparina" packages that appear in the September 23 photographs that are also on this Motorola phone (the phone being in the hands of Tony Lam (in the "selfie") on September 20), and which appear identical to the packages discovered to contain heroin on October 6.

26.      Data from the GPS navigational device that was found within the vehicle Mejia Paredes was driving upon his arrest show that from about 2am to shortly before noon on September 24, 2015, the device travelled from Bennington County Vermont, to a location outside Boston, then to a location in Rhode Island, then returned to Bennington County Vermont.  EZ Pass records confirmed that the EZ Pass device found within the Audi A6 passed through toll booths on the Massachusetts Turnpike at times consistent with the GPS data on September 24. EZ Pass records confirm that the device is in the account of Marco Lam, with an address of 59 Route 30, Bondville, Vermont.  I know based on surveillance and public records that this is the location of the Tony's New York Style Pizza restaurant.  HSI agents have obtained a copy of a check used to pay the rent for Mejia Paredes by Tony Lam.  The check is from the operating account of Double Play Inc. DBA Tony's NY Style Pizza of Bondville, Vermont.  Also of note, one of the September 23, 2015 photographs found on the Motorola phone possessed by

Mejia Paredes showed packages of Incaparina in a box labeled to have contained Italian cheese.

27.        On October 21, 2015, the Grand Jury in Rutland, Vermont returned a one count Indictment charging MEJIA with possession with intent to distribute more than a kilogram of heroin in connection with the above-described events. I have learned that in 2010, MEJIA was indicted by a Grand Jury in the District of Maryland, charged with, among other crimes, conspiracy to distribute and conspiracy to import controlled substances. I have been advised that Mejia was never arrested in connection with this Indictment, and that this indictment remained sealed as to MEJIA. I am further advised that this indictment has recently been dismissed.

Involvement with the Target Cellular Device

28.        The phone number for the Target Cellular Device was saved in one of MEJIA's cell phone's contacts as "Maqito." MEJIA's cell phone showed that MEJIA was contacted by the Target Cellular Device five times from 2:20pm to 3:55pm while MEJIA was waiting for the delivery of the shipment. MEJIA's cell phone also showed that MEJIA called the Target Cellular Device at 4:03pm after receiving the shipment. (Phone records indicate this was the only call MEJIA made after receiving the shipment and before being arrested.) MEJIA stated the

12

Target Cellular Device (i.e., the "Maqito" phone) was used by his cousin Tony Lam. MEJIA stated that LAM was in constant contact with him prior to MEJIA receiving the packages because LAM's son was in the hospital with a leg injury. MEJIA stated he called LAM after receiving the packages to ask for directions because he was lost.

29.     Toll analysis of the Target Cellular Device also revealed that it contacted DHL (the shipping company delivering the heroin-containing shipment) at 2:24pm and 2:31pm on October 8, 2015.

30.     Based on the above description of events, information, and communications involving the Target Cellular Device, I believe it is probable that the user of the Target Cellular Device was tracking the location of the heroin-containing shipment and had an interest in knowing when it had been received by MEJIA. From this information I infer it is probable that the user of the Target Cellular Device was aware of the contraband nature of the shipment and is involved in a conspiracy associated with its importation for redistribution.

31.     This Court issued a warrant on or about October 26, 2015 authorizing the acquisition of location data from the Target Cellular Device's service provider. The information obtained pursuant to that warrant has confirmed the general location of the device, but usually within a range of several hundred meters. In

order to discern who is using the Target Cellular Device, more precise location data is desired in order to determine who is the user of this device.

32. Based upon the above-described facts, confirming the precise location of the Target Cellular Device phone over the next 30 days should facilitate the identification of the primary user(s) of the Target Cellular Device.

## MANNER OF EXECUTION

33. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

34. To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Cellular Device or receiving signals from nearby cellular devices, including the Target Cellular Device. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The

14

device may send a signal to the Target Cellular Device and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to determine the Target Cellular Device's location, even if it is located inside a house, apartment, or other building.

35.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

## AUTHORIZATION REQUEST

36.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.  The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

37.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance.  This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cellular Device would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and [continue to] flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1).  There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

38.    I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

39.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  In addition, if these materials were public, it is likely that whoever is using the Target Cellular Device will cease doing so, thus undermining the investigative purpose of the requested-warrant.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

40.     I am advised that a search warrant may not be legally necessary to compel the investigative technique described herein.  Nevertheless, I hereby submit this warrant application out of an abundance of caution.

Respectfully submitted,

BRIAN WOOD
Special Agent
HSI TFO

Subscribed and sworn to before me
On: Nov. 9, 2015

JOHN M. CONROY
UNITED STATES MAGISTRATE JUDGE

17