

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

IN THE MATTER OF THE SEARCH
OF LOCATION DATA
CONCERNING A CELLULAR
TELEPHONE ASSIGNED CALL
NUMBER (802) 430-1620 WHOSE
SERVICE PROVIDER IS AT&T, A
COMPANY HEADQUARTERED IN
DALLAS, TEXAS

Case No. 2:15-mj-151

Filed Under Seal

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

1. I, Brian Wood, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

2. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (802) 430-1620, with International Mobile Subscriber Identity / Electronic Serial Number 310410848941677 (the "Target Phone" or "Target Cell Phone"), whose service provider is AT&T, subscribed to in the name of "Prepaid Customer," 31 Memorial Ave, Manchester Center, VT, 05255. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

3.  I am a Task Force Agent with Department of Homeland Security, Homeland Security Investigations, and have been since January 2014.  I have received training and participated in investigations involving the use of computers, cell phones, and other electronic devices, and am familiar with the use of location data provided by cell phone carriers in furtherance of investigations in both drug trafficking offenses as well as immigration crimes.

4.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.  Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § § 841 and 846 have been committed, are being committed, and that the location information described in Attachment B will constitute and lead to evidence of these criminal violations.

## PROBABLE CAUSE

### Controlled Delivery of Heroin-Containing Shipment

6.  On October 6, 2015, customs officials in Miami determined pursuant to inspection and through the use of field tests that a DHL shipment from

Guatemala destined for an address in Manchester Center, Vermont, contained a substantial quantity of heroin. That shipment, which consisted of two boxes together weighing more than 50kgs, was transported to the HSI office in Chittenden County, Vermont, where additional field testing indicated that that shipment contained more than 40 kilograms of heroin.

7. Within the shipment, the heroin was contained within smaller packages that appeared to be a Guatemalan food product known as "Incaparina." I have learned during my work on this investigation that Incaparina is a nutritional supplement in Guatemala for babies, toddlers, and pregnant women. The shipment contained two sizes of "Incaparina" packages. The smaller size was branded "Recimax de Incaparina," and weighed approximately 500 grams each. The larger size was branded "Incaparina" and weighed approximately 1.2 kilograms each. There were approximately 40 small Incaparina packages (of about 500 grams each) and approximately 16 large Incaparina packages (of about 1.2 kilograms each).

8. After removing all but a little more than a kilogram from each box (and replacing the removed contraband with filler of similar density), the packages were re-sealed, and taken to the address location by an HSI agent wearing a DHL uniform. The address was a restaurant on Main Street in Manchester Center, Vermont. A man later identified as Diego Mejia

Paredes took delivery of these packages at that location and was arrested shortly thereafter.

9. Prior to that controlled delivery, agents set up surveillance at the delivery location in Manchester center.   They observed Mejia waiting outside the delivery location for nearly 2 hours.  He arrived at the location in a 2001 Audi A6.  When he took delivery of the packages, they were placed in the trunk of this car.

10. Following his apprehension, MEJIA stated, at least initially, that he did not know what was in the boxes.  Subsequently, he confirmed that he knew that the boxes contained packages that appeared to be food product, and specifically a food product called "Incaparina."  MEJIA made this statement without having been shown the contents of the boxes.  When shown a photograph of the "Incaparina" packages inside one of the boxes, he responded in the affirmative.  He maintained that he was unaware that the packages contained controlled substances.

11. MEJIA also stated he was in the United States to visit his cousin, Tony LAM, and to purchase vehicles to bring back and sell in Guatemala.  Law enforcement from Bennington County Vermont and Immigration Records confirm that Tony LAM is Marco Antonio LAM Peralta, a Guatemalan with lawful permanent resident status who lives in Bennington County, and who

operates a pizza restaurant called Tony's New York Style Pizza on Route 30 in Bondville, Vermont.

12. MEJIA claimed that a friend in Guatemala asked MEJIA to do him a favor and pick up two packages at the restaurant in Manchester, VT.  MEJIA was to pick up the packages and then contact the friend.  The friend was then going to send someone to MEJIA to take possession of the packages.  The friend told MEJIA that the packages contained Incaparina, a powder from Guatemala to make drinks for babies and mothers.  MEJIA stated that he had never participated in the sending or receipt of packages like this in the past. MEJIA was under the impression that the packages may be headed to Rhode Island or Connecticut.  MEJIA had received and signed for the two packages out front of the restaurant address and told the delivery person that he was accepting the packages for his cousin.  After his arrest MEJIA claimed his only cousin in the area was Tony LAM, but that the packages were not destined for LAM.  MEJIA stated the vehicle (the Audi A6) he was driving had been provided to him by LAM.

13. On October 21, 2015, the Grand Jury in Rutland, Vermont returned a one count Indictment charging MEJIA with possession with intent to distribute more than a kilogram of heroin in connection with the above-described events.  I have learned that in 2010, MEJIA was indicted by a Grand Jury in

the District of Maryland, charged with, among other crimes, conspiracy to distribute and conspiracy to import controlled substances.  I have been advised that Mejia was never arrested in connection with this Indictment, and that this indictment remained sealed as to MEJIA.  I have more recently learned that the Maryland Indictment is not sealed.   I am further advised that this indictment has been dismissed as to Mejia.

## Additional Connections to Tony LAM

14.  Data on the Motorola Phone.  Upon his arrest agents determined that Mejia possessed two phones.  Mejia consented to the search of both phones.   One phone was a Motorola android device, which agents have been able to search.

15. The black Motorola cell phone possessed by MEJIA upon his arrest contained photographs of scenery I recognize to be Niagara Falls.  Metadata for these images indicate they were taken on or about September 20, 2015.  I recognize one photo taken on this date to be a "selfie" of Tony LAM (who I recognize based on personal surveillance and comparison to Department of Motor Vehicle photos).   Customs records confirm that Marco Antonio LAM Peralta (who is known as Tony LAM) entered the United States near Niagara Falls on September 20, 2015.  Accordingly, I believe LAM was in possession of the Motorola Cell phone on or about September 20, 2015.

16. According to records obtained from DHL, a previous shipment from the same sender of the package that was discovered to contain heroin on October 6, 2015, was signed for as received shortly after 1:00pm on September 23, 2015 at a location in or near Manchester Center, Vermont. The address of this September 23 shipment was an address on Brightwood Road, in Manchester Center, Vermont.  I have consulted with a member of law enforcement who has recently interviewed the owner of the address on Brightwood Road to which the September 23 package was addressed. According to the owner, LAM was a previous resident at this address, though he had not lived there for several years.

17. Images on the Motorola phone that Paredes Mejia possessed upon his arrest include several photographs, the metadata for which indicate they were taken on September 23, 2015 between about 1:40pm and 2:02pm.   One photo, shows an unopened box wrapped in DHL branded wrapping. Another photos shows what appears to be that box opened to contain food packages, including packages of Incaparina that appear identical to those that contained heroin on October 8, 2015.    Another photo shows approximately 12 of the larger Incaparina packages in another box – a box whose exterior markings indicate it was originally used for a shipment of

Italian cheese.   Another photo shows several of the smaller Incaparina packages (also in a box).

18. Other data on this Motorola phone includes the contents of a text messaging exchange between the holder of the phone, and a person identified as "DPareds" using the blackberry messaging application.   Portions of this exchange are dated September 23, 2015.  These messages are in Spanish.  I have consulted with DHS personnel and others who are proficient in Spanish regarding these messages.  The messages appear to include direction from "DPareds" to the holder of the Motorola cell phone with regard to the distribution of 12 or 13 "large incas" ("incas grandes"), as well as "smalls" ("pequenos").  I believe it is probable that the term "Inca" in this context refers to the "Incaparina" packages that appear in the September 23 photographs (some of which – based on my review of similar packages containing heroin in the October 6 shipment from the same sender were about 1.2 kilograms, and others of which were about half a kilogram). Another portion of the text exchange between DPareds and the holder of this phone, dated October 2, 2015, includes a message from the holder of the phone to DPareds stating the address to which the October 8 heroin-containing shipment was to be addressed in Manchester Center, Vermont.

19. <u>Data on the GPS Device and EZ Pass.</u> Upon his October 8, 2015 arrest, MEJIA also consented to the search of the GPS navigation device that was within the Audi A6 vehicle he was travelling in upon his arrest. Data from the GPS navigational device show that from about 2am to shortly before noon on September 24, 2015, the device travelled from Bennington County Vermont, to a location outside Boston, then to a location in Rhode Island, then returned to Bennington County Vermont. EZ Pass records confirmed that the EZ Pass device also found within the Audi A6 passed through toll booths on the Massachusetts Turnpike at times consistent with the GPS data on September 24. EZ Pass records confirm that the device is in the account of Marco LAM, with an address of 59 Route 30, Bondville, Vermont. I know based on surveillance and public records that this is the location of the Tony's New York Style Pizza restaurant. Additional EZ Pass records show that the charges for this EZ Pass were paid out of a bank account that additional investigation has confirmed is an account associated with Tony's NY Style Pizza restaurant.

20. <u>Credit Card Records</u> I have also reviewed the account history for a First Premier Bank credit card that is in the name of Marco A Lam Sr. The

records for this account indicate that it made three purchases in Massachusetts on September 24, 2015, including one at a Gulf Oil in Charlton, Massachusetts.   A review of publicly available information about a rest area on the Massachusetts turnpike in Charlton, indicates that there is a Gulf gas station and convenience store at that location.   The data from the GPS navigation device indicates that the device stopped at the Charlton service area off the turnpike at approximately 3:59am on September 24, 2015.   The data supplied by the credit card company does not specify the time the card was used in this transaction.

21. I have also heard a recorded phone call between a man who identifies himself as "Marco A. Lam, Sr." and First Premier Bank customer service, that according to First Premier Bank records occurred on September 25, 2015.   During that call, LAM states that the day before he tried to use his credit card at a gas station in Massachusetts.

22.  LAM's Continued Association with the Audi Within the last month agents have observed the same Audi A6 that was used by MEJIA upon his arrest has been advertised for sale outside Tony's NY Style Pizza restaurant in Bondville, Vermont.   A member of law enforcement, acting undercover, has inquired about possible purchasing the vehicle.   In doing so, Tony LAM was

the point of contact for the potential purchaser of the vehicle.  LAM advised

the undercover agent that the car originally belonged to his "uncle" but that

it was now LAM's to sell.  During the undercover agent's inspection of the

car, the agent observed a box that appears very similar to the Italian cheese

box observed to contain packages of Incaparina in one of the September 23,

2015 images.

23. LAM's Shoes  During recent surveillance agents have recently observed

Tony LAM's shoes.  They are gray New Balance sneakers, and appear to be

of the same style as portions of footwear seen standing next to some of the

September 23 photos of packages of Incaparina.

24. LAM's Involvement Housing Mejia and Another  Agents, including myself,

have interviewed property owners of an apartment located less than a mile

from Tony's New York Style Pizza in Bondville.  These property owners

advised that Mejia, and another man – known to them as "Michael Lopes" –

had been living at their apartment and that their rent had been paid by Tony

LAM.  This landlord has recently advised that LAM continues to pay the

rent to house "Michael Lopes."  (MEJIA remains in custody following his

arrest.)  The landlord stated that LAM advised the landlord that Lopes works

at the Pizza restaurant.  LAM has paid the rent for this apartment with

checks from the same Tony's NY Style Pizza bank account that paid for EZ Pass charges, described above.

25. Following Mejia's arrest, the registered owner of the Audi A6 operated by MEJIA upon his arrest, Vincent Macri, came to the Vermont States Police Barracks in Rutland to retrieve the keys to the vehicle.  While there, Macri stated he was Tony LAM's business partner in the pizza restaurant and that LAM told Macri that MEJIA had been hired by LAM to wash dishes at the restaurant.

26. Immigration records indicate that MEJIA entered the United States on or about July 16, 2015, and departed the United States on or about August 17, 2015, before returning again, as mentioned above, on or about October 5, 2015.  The landlords stated they were aware that MEJIA had been away for a period of time.

27. Agents have obtained a copy of a check used to pay the rent for MEJIA by Tony LAM.  The check is from the operating account of Double Play Inc. DBA Tony's NY Style Pizza of Bondville, Vermont.  This is the same account that paid for EZ Pass charges on the Audi, described above.

## INVOLVMENT OF THE TARGET PHONE

28. The phone number for the Target Phone was saved in one of MEJIA's cell phone's contacts as "Maqito."  I have learned during the course of this investigation that one of LAM's nicknames is Maco (the name is used on the publicly available face book page, for example, and I have seen other text messages referring to him as "Maco").  I know that "Maqito" is a diminutive form of the name Maco in Spanish.

29. MEJIA's cell phone showed that MEJIA was contacted by the Target Phone five times from 2:20pm to 3:55pm while MEJIA was waiting for the delivery of the shipment.  MEJIA's cell phone also showed that MEJIA called the Target Cellular Device at 4:03pm after receiving the shipment. (Phone records indicate this was the only call MEJIA made after receiving the shipment and before being arrested.)  MEJIA stated the Target Cellular Device (i.e., the "Maqito" phone) was used by his cousin Tony LAM. MEJIA stated that LAM was in constant contact with him prior to MEJIA receiving the packages because LAM's son was in the hospital with a leg injury.  MEJIA stated he called LAM after receiving the packages to ask for directions because he was lost.

30. Toll analysis of the Target Cellular Device also revealed that it contacted DHL (the shipping company delivering the heroin-containing shipment) at 2:24pm and 2:31pm on October 8, 2015, while MEJIA was waiting for the heroin-containing DHL shipment.

31. Toll analysis of the Target Phone also indicated that it was used to call First Premier Bank on September 25, 2015, and the reservation numbers associated with the Crown Plaza hotel company on November 10, 2015. I have listened to recordings of both of these calls that were preserved and produced by the called company during the course of this investigation. On the call to the bank, the caller identifies himself as Marco A. Lam, Sr. On the call to the hotel reservation line, the caller identifies himself as Marco Lam. The voice on both calls sounds to be the same man.

32. On October 26, 2015, this Court issued an order permitting the deployment and use of a pen register and trap and trace device with respect to the Target phone. An order extending the October 26 order for an additional 60 days was issued yesterday. Agents monitoring the use of the Target Phone have discerned no material change in the use of the phone to suggest its primary user has changed. Accordingly, I believe Tony LAM continues to be the primary user of the Target Phone.

33. Based on the above description of events, information, and communications involving the Target ~~Cellular Device~~ Phone, I believe it is probable that the user of the Target ~~Cellular Device~~ Phone was tracking the location of the heroin-containing shipment and had an interest in knowing when it had been received by MEJIA. From this information I infer it is probable that the user of the Target ~~Cellular Device~~ Phone was aware of the contraband nature of the shipment and is involved in a conspiracy associated with its importation for redistribution.

34. On October 26, 2015, this Court issued a search warrant identical to the one requested herein to location data relating to this phone. Execution of this warrant provided general information about the location of the phone, but while the device was in Southern Vermont, that data was generally not very precise. On November 9, 2015, this Court issued another warrant permitting HSI personnel to utilize a cell-site simulator to locate the phone with more precision. Execution of that warrant confirmed that the Target Cell Phone was the only phone discerned to be present at multiple locations where LAM was observed by surveilling agents.

35. Based upon the above, I believe Tony LAM has been and continues to be the primary user of the Target Phone.

## Additional Background Information

36. I know based upon my training and experience that persons who are involved in the distribution of millions of dollars' worth of controlled substances, necessarily must communicate with the sources and recipients of that contraband.  Such communications can occur telephonically, by voice or by messaging application, by email, or in person.  I also know based on my training and experience that when a large quantity of controlled substances are intercepted by law enforcement, persons within the organization associated with the seized contraband are frequently held to account for the inventory.   I also know that organizations that are involved in the importation of large quantities of controlled substances typically do not stop their importation efforts based upon only one arrest or seizure by law enforcement.  As shown above, it has been demonstrated that the Target Phone appears to have been involved in the importation and distribution of large quantities of heroin, and that the Target Phone has been and continues to be used by Tony LAM.  It has also been shown that Tony LAM appears to be a trusted member of the drug trafficking organization involved in the importation of heroin from Guatemala into the United States.

37. Accordingly, continued monitoring of the location (and use) of the Target Phone is likely to lead to evidence of the operation of this organization, the location of Tony LAM, who appears to be a member of this organization, as well as help identify other persons who may be involved.

38. In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generated at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be

10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

39. Based on my training and experience, I believe that AT&T can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on AT&T's network or with such other reference points as may be reasonably available.

40. Based on my training and experience, I know that AT&T can collect cell-site data about the Target Cell Phone.

## AUTHORIZATION REQUEST

41. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

42. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result,

as defined in 18 U.S.C. § 2705.  Providing immediate notice to the

subscriber or user of the Target Cell Phone would seriously jeopardize the

ongoing investigation, as such a disclosure would give that person an

opportunity to destroy evidence, change patterns of behavior, notify

confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As

further specified in Attachment B, which is incorporated into the warrant,

the proposed search warrant does not authorize the seizure of any tangible

property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the

warrant authorizes the seizure of any wire or electronic communication (as

defined in 18 U.S.C. § 2510) or any stored wire or electronic information,

there is reasonable necessity for the seizure for the reasons set forth above.

*See* 18 U.S.C. § 3103a(b)(2).

43. I further request that the Court direct AT&T to disclose to the government

any information described in Attachment B that is within the possession,

custody, or control of AT&T.  I also request that the Court direct AT&T to

furnish the government all information, facilities, and technical assistance

necessary to accomplish the collection of the information described in

Attachment B unobtrusively and with a minimum of interference with

AT&T's services, including by initiating a signal to determine the location

of the Target Cell Phone on AT&T's network or with such other reference

points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

44. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

45. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Were the information to become public, the person or persons using the Target Cell Phone would likely cease such use, thereby undermining the utility of the requested warrant.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

BRIAN WOOD
Task Force Officer
Homeland Security Investigations

Subscribed and sworn to before me on December 23, 2015

_____
JOHN M. CONROY
UNITED STATES MAGISTRATE JUDGE